Jonathan F. Mitchell*
Texas Bar No. 24075463
Mitchell Law PLLC
106 East Sixth Street, Suite 900
Austin, Texas 78701
(512) 686-3940

* *pro hac vice* application forthcoming

Bradley Benbrook
California Bar No. 177786
Benbrook Law Group, PC
400 Capitol Mall, Suite 2530
Sacramento, California 95814
(916) 447-4900

*Counsel for Plaintiffs and Proposed Class*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

| | |
|---|---|
| **Ruth Aliser, Teresa Boyle, Renee Browne, Stephanie Caudel, Peter Finn, Samira Golbad, Tom McCavitt, Kenton Miller, Mariam E. Noujaim, Lorenzo Nolan, Maureen O'Brien, Javier Palmerin, Barbara Park, Erin Thompson**, and **James White**, as individuals, and on behalf of others similarly situated, | Case No. _____ |
| Plaintiffs, | |
| v. | **Plaintiffs' Class-Action Complaint Jury Trial Demanded** |
| **SEIU California; California State University Employees Union, SEIU Local 1000, SEIU Local 521, SEIU Local 721, SEIU Local 1021, SEIU Local 2015**, as individual defendants and as representatives of the class of all | |

chapters and affiliates of SEIU
California; **California State Employees
Association**; **California State Retirees**;
**Board of Trustees of the California
State University**; **Edmund G. Brown**,
in his official capacity of Governor of the
State of California; **Xavier Becerra**, in
his official capacity as Attorney General
of the State of California; **Betty Yee**, in
her official capacity as State Controller of
California; **Eric Banks**, **Priscilla
Winslow**, **Erich Shiners**, and **Arthur A.
Krantz**, in their official capacities as
chair and members of the California
Public Employment Relations Board;
**Priya Mathur**, **Rob Feckner**, **Margaret
Brown**, **John Chiang**, **Richard
Costigan**, **Dana Hollinger**, **Adria
Jenkins-Jones**, **Henry Jones**, **David
Miller**, **Ramón Rubalcava**, **Bill Slaton**,
**Theresa Taylor**, and **Betty Yee**, in their
official capacities as members of the
Board of Administration for the
California Public Employees' Retirement
System; **Alex M. Azar II**, in his official
capacity as Secretary of Health and
Human Services; **Seema Verma**, in her
official capacity as Administrator of the
Centers for Medicare and Medicaid
Services; **United States of America**,

Defendants.

Ruth Aliser, Teresa Boyle, Renee Browne, Stephanie Caudel, Peter Finn, Samira

Golbad, Tom McCavitt, Kenton Miller, Mariam E. Noujaim, Lorenzo Nolan,

Maureen O'Brien, Javier Palmerin, Barbara Park, Erin Thompson, and James White

are current or former public employees who were forced to pay money to affiliates of

SEIU California in violation of their constitutional rights. They sue on behalf on

themselves and others for a refund of money that was taken from them in violation of

the Constitution. The plaintiffs are also seeking prospective relief against constitutional violations that the defendants are committing in the wake of *Janus v. AFSCME Council 31*, 138 S. Ct. 2448, 2486 (2018).

## JURISDICTION AND VENUE

1.  The Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343, and 28 U.S.C. § 1367.

2.  Venue is proper because at least one defendant resides or has its offices located in this judicial district. *See* 28 U.S.C. § 1391(b)(2).

## PARTIES

3.  Plaintiff Ruth Aliser resides in Tulare County, California.

4.  Plaintiff Teresa Boyle resides in Los Angeles County, California.

5.  Plaintiff Renee Browne resides in San Diego County, California.

6.  Plaintiff Stephanie Caudel resides in Riverside County, California.

7.  Plaintiff Peter Finn resides in Sacramento County, California.

8.  Plaintiff Samira Golbad resides in Riverside County, California.

9.  Plaintiff Tom McCavitt resides in San Mateo County, California.

10.  Plaintiff Kenton Miller resides in Kern County, California.

11.  Plaintiff Mariam Noujaim resides in El Dorado County, California.

12.  Plaintiff Lorenzo Nolan resides in Los Angeles County, California.

13.  Plaintiff Maureen O'Brien resides in San Mateo County, California.

14.  Plaintiff Javier Palmerin resides in San Bernardino County, California.

15.  Plaintiff Barbara Park resides in Santa Clara County, California.

16.  Plaintiff Erin Thompson resides in San Mateo County, California.

17.  Plaintiff James White resides in Sacramento County, California.

18.  Defendant SEIU California is a labor union whose offices are located at 1130 K Street, Sacramento, California 95814.

19. Defendant California State University Employees Union (CSUEU), also known as SEIU Local 2579, is a labor union whose offices are located at 1108 O Street, #500, Sacramento, California 95814. CSUEU is an affiliate of SEIU California. CSUEU is sued as an individual defendant and as a representative of the class of all chapters and affiliates of SEIU California.

20. Defendant SEIU Local 1000 is a labor union whose offices are located at 1808 14th Street, Sacramento, California 95811. SEIU Local 1000 is an affiliate of SEIU California. SEIU Local 1000 is sued as an individual defendant and as a representative of the class of all chapters and affiliates of SEIU California.

21. Defendant SEIU Local 521 is a labor union whose offices are located at 5228 East Pine Avenue, Fresno, California 93727. SEIU Local 521 is an affiliate of SEIU California. SEIU Local 521 is sued as an individual defendant and as a representative of the class of all chapters and affiliates of SEIU California.

22. Defendant SEIU Local 721 is a labor union whose offices are located at 1545 Wilshire Boulevard, Suite 100, Los Angeles, California 90017. SEIU Local 721 is an affiliate of SEIU California. SEIU Local 721 is sued as an individual defendant and as a representative of the class of all chapters and affiliates of SEIU California.

23. Defendant SEIU Local 1021 is a labor union whose offices are located at 447 29th Street, Oakland, California 94609. SEIU Local 1021 is an affiliate of SEIU California. SEIU Local 1021 is sued as an individual defendant and as a representative of the class of all chapters and affiliates of SEIU California.

24. Defendant SEIU Local 2015 is a labor union whose offices are located at 2910 Beverly Boulevard, Los Angeles, California 90057. SEIU Local 2015 is an affiliate of SEIU California. SEIU Local 2015 is sued as an individual defendant and as a representative of the class of all chapters and affiliates of SEIU California.

25. Defendant California State Employees Association (CSEA) is an entity that provides business services for public-employee unions in California, including SEIU Local 1000 and the CSUEU. Its offices are located at 1108 O Street Sacramento, California 95814.

26. Defendant California State Retirees is a membership organization that represents state government retirees. It is affiliated with the California State Employees Association (CSEA), and was formerly known as the California State Employees Association Retirees. Its offices are located at 1108 O Street Sacramento, California 95814.

27. Defendant Board of Trustees of the California State University is a public university. It may be served at its Office of General Counsel, 401 Golden Shore, Fourth Floor, in Long Beach, California 90802.

28. Defendant Edmund G. Brown is the governor of California. His office is located at the State Capitol, Suite 1173, Sacramento, California, 95814. Governor Brown is the representative of the State and is sued in his official capacity.

29. Defendant Xavier Becerra is the Attorney General of California. His office is in Sacramento, California. Attorney General Becerra is the chief law officer of the State and is charged with enforcing the State's laws—including section 1157.12(b) of the California Government Code, which the plaintiffs are challenging as unconstitutional. Attorney General Becerra is sued in his official capacity.

30. Defendant Betty Yee is the State Controller of California. She can be served at the Legal Office, State Controller's Office, 300 Capitol Mall, Suite 1850, Sacramento, California 95814. Controller Yee is sued in her official capacity.

31. Defendants Eric Banks, Priscilla Winslow, Erich Shiners, and Arthur A. Krantz are chair and members of the California Public Employment Relations Board, the entity that oversees public-sector collective bargaining in California and administers

the State's labor and collective-bargaining laws, including section 1157.12(b) of the California Government Code, which the plaintiffs are challenging as unconstitutional. Their offices are located at 1031 18th Street, Sacramento, California 95811-4124. They are all sued in their official capacities.

32. Defendants Priya Mathur, Rob Feckner, Margaret Brown, John Chiang, Richard Costigan, Dana Hollinger, Adria Jenkins-Jones, Henry Jones, David Miller, Ramón Rubalcava, Bill Slaton, Theresa Taylor, and Betty Yee are members of the Board of Administration of the California Public Employees' Retirement System (CalPERS). Their offices are located at 400 Q Street, Sacramento, CA 95811. They are all sued in their official capacities.

33. Defendant Alex M. Azar II is the U.S. Secretary of Health and Human Services. His office is located at 200 Independence Avenue S.W., Washington, D.C. 20201. Secretary Azar is sued in his official capacity.

34. Defendant Seema Verma is Administrator of the Centers for Medicare and Medicaid Services. Her office is located at 7500 Security Boulevard, Baltimore, Maryland 21244. Administrator Verma is sued in her official capacity.

35. Defendant United States of America is the federal government of the United States of America.

## STATEMENT OF FACTS—CSUEU DEFENDANTS

**1. Renee Brown**

36. Plaintiff Renee Browne is employed by Cal State University San Marcos. She works as an accounts payable technician.

37. Ms. Browne began her employment in an "agency shop," where she was forced to either join the CSUEU and pay full membership dues, or else pay "fair share service fees" to the union as a condition of her employment.

38. Ms. Browne opposed and continues to oppose paying dues to the CSUEU, because she disapproves of the union's political advocacy and the grossly excessive salaries that the union pays its leaders.

39. Nevertheless, Ms. Browne enrolled in union membership because she was led to believe that she was required to join the union as a condition of her employment.

40. Neither the CSUEU nor Ms. Browne's employer ever informed her that her union membership dues would be used to fund political lobbying and ideological causes that are not germane the union's duties as a collective-bargaining representative. Had Ms. Browne been informed that her union membership dues would be used in this manner, she never would have agreed to join the union or submit to full membership dues.

41. Ms. Browne never would have joined or paid any money to the union had she not been forced to work in an unconstitutional agency shop.

42. After the Supreme Court announced its ruling in *Janus v. AFSCME Council 31*, 138 S. Ct. 2448 (2018), Ms. Browne resigned her union memberships and demanded that the union stop tapping her paychecks.

43. On August 28, 2018, Ms. Browne sent a resignation e-mail to Vanessa Vincent, the President of CSUEU Chapter 321. The e-mail read: "I am resigning my membership in the CSUEU Chapter 321 and all of its affiliates effective immediately. Please immediately stop taking union membership dues or any other union-related fees from my paycheck.  Let me know if there is any other action needed from me on this." *See* Exhibit 6.

44. Ms. Browne sent this resignation e-mail from her work e-mail account, and she cc'd Ms. Alejandra Sanchez, the Vice President of CSUEU Chapter 321 and an Administrative Support Coordinator at CSU San Marcos. Ms. Browne also cc'd Jane Cross, the director of payroll services at CSU San Marcos. *See* Exhibit 6.

45. On September 10, 2018—13 days after Ms. Browne sent her resignation e-mail—a union official e-mailed Ms. Browne and informed her that the CSUEU would continue to take union dues from her paycheck notwithstanding Ms. Browne's resignation. The e-mail read: "Hi Renee, Cancellations are only accepted via mailed USPS letter, signed with the last 4 digits of your Social Security number to: CSUEU 120 K Street 2nd Floor Sacramento, CA 95814. If you have any additional questions please let me know." *See* Exhibit 6.

46. Neither Ms. Sanchez nor Ms. Cross has ever acknowledged or responded to Ms. Browne's request to halt the payroll deduction of union dues.

47. The CSUEU and its affiliates are continuing to tap Ms. Browne's paycheck for union dues, and CSU San Marcos is continuing to divert Ms. Browne's wages to the CSUEU—in defiance of Ms. Browne's announced resignation from the union and her demand to immediately halt the payroll deduction of union dues.

**2. Kenton Miller**

48. Plaintiff Kenton Miller is employed by Cal State University Bakersfield. He works as an Information Technology Consultant.

49. In 1999, Mr. Miller's employment switched to an "agency shop," where he was forced to either join the CSUEU and pay full membership dues, or else pay "fair share service fees" to the union as a condition of his employment.

50. Mr. Miller initially opted for "fair share service fees." But in 2003, after the union increased the "fair share service fees" to 95% of union membership dues, Mr. Miller reluctantly joined the union because he decided that the amount of money that he would save was not worth the loss of his vote on union leadership and collective-bargaining matters.

51. Mr. Miller never would have joined or paid any money to the union had he not been forced to work in an unconstitutional agency shop—and had he not been

1    subject to an unconstitutional financial penalty for exercising his constitutional right
2    to decline union membership.

3        52.  After the Supreme Court announced its ruling in *Janus v. AFSCME Council*
4    *31*, 138 S. Ct. 2448 (2018), Mr. Miller resigned his union membership and de-
5    manded that the union stop tapping his paychecks.

6        53.  On July 23, 2018, Mr. Miller sent a resignation e-mail to CSUEU officials
7    Nicholas Simas, Milissa Ackerly, Neil Jacklin, and Frank Pulido. The e-mail read: "I
8    Kenton Miller, resign my membership in CSUE unit 9, immediately, and I want my
9    payroll deduction to cease immediately. In light that the Supreme Court has said the
10   taking of "Fair share" fees is unconstitutional, I want all past fees taken from me to
11   be returned." *See* Exhibit 7.

12       54.  Mr. Miller sent this resignation e-mail from his work e-mail account, and he
13   cc'd Tina Williams, the Payroll Manager at CSU Bakersfield, and Marie Freeze, the
14   Administrative Support Coordinator in the CSU Bakersfield payroll office. *See* Exhibit
15   7.

16       55.  On July 27, 2018, a union official e-mailed Mr. Miller and informed him that
17   the CSUEU would continue to take union dues from his paycheck notwithstanding
18   Mr. Miller's resignation. The e-mail read: "Hi Kenton, Cancellations are only ac-
19   cepted via USPS mail. Please sign and send a cancellation letter with the last 4 digits
20   of your social security number to: CSU Employees Union, 1108 "O" Street 5th Floor
21   Sacramento, CA 95814. If you have any additional questions please let us know." *See*
22   Exhibit 7.

23       56.  Neither Ms. Williams nor Ms. Freeze has ever acknowledged or responded to
24   Mr. Miller's request to halt the payroll deduction of union dues.

25       57.  The CSUEU and its affiliates are continuing to tap Mr. Miller's paycheck for
26   union dues, and CSU Bakersfield is continuing to divert Mr. Miller's wages to the

1  CSUEU—in defiance of Mr. Miller's announced resignation from the union and his

2  demand to immediately halt the payroll deduction of union dues.

3  **STATEMENT OF FACTS—SEIU LOCAL 1000 DEFENDANTS**

4  **1. Peter Finn**

5  58.  Plaintiff Peter Finn is an Information Security & Privacy Analyst for the Office

6  of Statewide Health Planning and Development. He has worked there since 2009.

7  59.  Mr. Finn began his employment in an "agency shop," where he was forced to

8  either join SEIU Local 1000 and pay full membership dues, or else pay "fair share

9  service fees" to the union as a condition of his employment.

10  60.  Mr. Finn opposed and continues to oppose paying dues to SEIU Local 1000,

11  because he strongly disapproves of the union's political activities as well as the grossly

12  excessive salaries that the union pays to its leaders.

13  61.  Nevertheless, Mr. Finn was automatically enrolled in union membership with-

14  out his consent, and the union has been tapping his paycheck since the outset of his

15  employment.

16  62.  Neither the union nor Mr. Finn's employer has ever informed him that he

17  had a constitutional right to refuse union membership and pay a reduced amount in

18  "fair share service fees." When Mr. Finn finally learned that he had this option in

19  2016, he promptly resigned his union membership and paid "fair share service fees"

20  to the union from July of 2016 through July of 2017.

21  63.  In bargaining units represented by SEIU Local 1000, a person who quits the

22  union and opts for "fair share service fees" is *still* required to pay an amount that is

23  close to 100% of full union membership dues, with no pro rata discount for the un-

24  ion's political and ideological activities. To avoid funding the union's political and

25  ideological advocacy, an employee must not only resign from the union but must also

26  take the *additional* step of declaring himself a "non-germane objector"—the term

that SEIU 1000 uses to describe the subset of "fair share service fee" payers who object to the union's political and ideological advocacy. "Non-germane objectors" pay a substantially reduced amount in "fair share service fees," which are discounted in proportion to the amount of the union's budget for political and ideological activities that are not germane to the union's collective-bargaining activities.

64. In 2016, when Mr. Finn resigned from the union, he also declared himself a "non-germane objector," and avoided funding the union's political and ideological advocacy from July of 2016 through July of 2017.

65. Had Mr. Finn been informed of his constitutional rights at the outset of his employment, he would have opted for "fair share service fees" and "non-germane objector" status from the get-go. Mr. Finn strenuously disagrees with the union's political and ideological advocacy and would not have opted to support it in any manner.

66. In July of 2017, however, the union *automatically* revoked Mr. Finn's status as a "non-germane objector" and started collecting "fair-share service fees" that approached 100% of full membership dues and that funded the union's political and ideological activities. The union took this step without ever seeking or obtaining Mr. Finn's permission or consent. When Mr. Finn discovered this and asked why the union had revoked his status as a "non-germane objector," he was told that he needed to renew his status as a non-germane objector *each year*, and that the union provides only a limited window of time in June for employees to "renew" their previous non-germane-objector status. The union also informed Mr. Finn that the renewal window for 2017 had closed and that he would have to continue funding the union's political and ideological advocacy until June 2018, when he would finally be provided the opportunity to once again enroll as a "non-germane objector."

67. Mr. Finn was not aware that he needed to affirmatively renew his "non-germane objector" status on an annual basis, and the union never sought or obtained permission to take his money to use for the union's political and ideological advocacy.

68. When Mr. Finn realized that he was stuck paying an amount of "fair share service fees" that was nearly 100% of full union membership dues until at least June 2018, and that he had no way to avoid funding the union's political and ideological advocacy until that time, Mr. Finn decided to enroll as a union member so he could vote against Yvonne Walker (the President of SEIU Local 1000) in the upcoming union election. The difference between full membership dues and the "fair share service fees" that Mr. Finn was forced to pay after the union revoked his "non-germane objector" status was approximately $2.00 per month, and Mr. Finn decided that this $2.00 difference was not worth the loss of his vote.

69. When the Supreme Court issued its decision in *Janus v. AFSCME Council 31*, 138 S. Ct. 2448 (2018), Mr. Finn promptly canceled his union membership and hand-delivered a resignation letter to the SEIU Local 1000 in early July. A copy of that letter is attached to the complaint as Exhibit 8.

70. On July 13, 2018, Mr. Finn e-mailed the payroll office at OSHPD to inform them that he had resigned his union membership. His e-mail stated: "I have resigned from SEIU and would like to know what steps I need to take to make sure they do not make any further deductions from my paycheck. I'd appreciate any information you can pass on. I can provide a copy of the resignation letter if needed." *See* Exhibit 8.

71. The payroll office did not respond to Mr. Finn's e-mail of July 13, 2018.

72. On July 17, 2018, Mr. Finn e-mailed his employer's payroll office once again. His e-mail said: "Good morning, I have not received a response to my message on the 13th. I'm attaching a copy of my resignation letter that I sent to SEIU and would

appreciate knowing if any further action is required on my part to stop SEIU from making deductions from my paycheck." *See* Exhibit 8.

73. Later that day, the payroll office e-mailed Mr. Finn and said: "Hi Peter, HR does not handle union dues/fees. You would have to contact your union rep or contact SEIU directly." *See* Exhibit 8.

74. The union continued to tap Mr. Finn's paycheck of July 31, 2018, for union dues, and Mr. Finn's employer continued to divert Mr. Finn's wages to SEIU Local 1000—in defiance of Mr. Finn's announced resignation from the union and his demand to immediately halt the payroll deduction of union dues. *See* Exhibit 8.

75. But when Mr. Finn received his paycheck of August 30, 2018, the union-related payroll deductions had finally ceased. *See* Exhibit 8.

**2. Mariam Noujaim**

76. Plaintiff Mariam Noujaim is a retired state employee who most recently worked for the California Department of Motor Vehicles.

77. Ms. Noujaim emigrated from Egypt to the United States in 1979. She began working for California in the Department of Justice in 1980.

78. Ms. Noujaim began her employment with the State in an "agency shop," where she was forced to either join the California State Employees Association and pay full membership dues, or else pay "fair share service fees" to the union as a condition of her employment.

79. Later in her career, Ms. Noujaim worked in bargaining units represented by SEIU Local 1000, and Ms. Noujaim was similarly forced to either join or pay "fair share service fees" SEIU Local 1000.

80. Ms. Noujaim was never told that she had a constitutional right to refuse union membership and pay a reduced amount in "fair share service fees," either by her employer or by the unions that she was compelled to support.

81. In 2007, Ms. Noujaim discovered that she had the option of quitting the union and paying "fair share service fees" rather than membership dues.

82. Nevertheless, Ms. Noujaim reluctantly chose to remain in SEIU Local 1000 because she decided that the difference between full membership dues and "fair share service fees" would not have been worth the loss of her vote in collective-bargaining matters.

83. Ms. Noujaim remained a reluctant member of SEIU Local 1000 until she retired in 2017, before the Supreme Court's ruling in *Janus*.

84. Ms. Noujaim never would have joined or paid any money to the CSEA or SEIU Local 1000 had she not been forced to work in an unconstitutional agency shop—and had she not been subject to an unconstitutional financial penalty for exercising her constitutional right to decline union membership.

**3. James White**

85. Plaintiff James White is an analyst for the California Department of Technology. He has worked for the State since May of 2014.

86. Mr. White began his employment in an "agency shop," where he was forced to either join SEIU Local 1000 and pay full membership dues, or else pay "fair share service fees" to the union as a condition of his employment.

87. Mr. White was informed during orientation that he had a choice between paying full membership dues and "fair share service fees."

88. Mr. White did not want to pay any amount of money to SEIU Local 1000, because he disapproves of the union's political advocacy and the grossly excessive salaries that the union pays its leaders.

89. Nevertheless, Mr. White reluctantly chose to join the union because he decided that the difference between full membership dues and "fair share service fees" would not have been worth the loss of his vote in collective-bargaining matters.

90. Mr. White never would have joined or paid any money to the union had he not been forced to work in an unconstitutional agency shop—and had he not been subject to an unconstitutional financial penalty for exercising his constitutional right to decline union membership.

91. Mr. White's pre-*Janus* "consent" to union membership was unconstitutionally coerced and legally invalid, and it cannot support the payroll deduction of union dues in a post-*Janus*, right-to-work environment.

92. Yet the union continues to tap Mr. White's paycheck for union dues, and the State of California continues to divert Mr. White's wages to SEIU Local 1000—even though neither the union nor the employer has ever obtained Mr. White's legally valid consent to union membership or the payroll deduction of union dues.

## STATEMENT OF FACTS—SEIU LOCAL 521 DEFENDANTS

### 1. Ruth Aliser

93. Plaintiff Ruth Aliser works for Fresno County Department of Social Services.

94. Before the Supreme Court's ruling in *Janus*, Ms. Aliser worked in an "agency shop," where employees were forced to either join SEIU Local 521 and pay full membership dues, or else pay "fair share service fees" to the union as a condition of their employment.

95. Ms. Aliser reluctantly decided to remain in the union because she decided that the difference between full membership dues and "fair share service fees" would not have been worth the loss of her vote in collective-bargaining matters.

96. Ms. Aliser never would have joined or paid any money to the union had she not been forced to work in an unconstitutional agency shop.

97. After the Supreme Court announced its ruling in *Janus*, Ms. Aliser promptly resigned her membership in SEIU Local 521. The union honored Ms. Aliser's resignation and stopped taking money from her paycheck.

**2. Tom McCavitt**

98.  Plaintiff Tom McCavitt is a former employee of San Mateo County. He resigned his employment on July 24, 2018.

99.  Mr. McCavitt began his employment with San Mateo County in an "agency shop," where employees were forced to either join SEIU Local 521 and pay full membership dues, or else pay "fair share service fees" to the union as a condition of their employment.

100.  When Mr. McCavitt began his employment with San Mateo County, he was told that union membership was a condition of employment. Neither his employer nor the union ever told Mr. McCavitt that he had a constitutional right to refuse union membership and pay a reduced amount in "fair share service fees."

101.  Because Mr. McCavitt was never informed of his rights and was led to believe that he was required to join the union as a condition of her employment, Mr. McCavitt was enrolled in union membership and paid dues to SEIU Local 521 for eight years. Had Mr. McCavitt been informed of his rights, he would have quit the union and paid "fair share service fees."

102.  Mr. McCavitt never would have joined or paid any money to the union had he not been forced to work in an unconstitutional agency shop.

**3. Barbara Park**

103.  Plaintiff Barbara Park works for Santa Clara County.

104.  Ms. Park began her employment with Santa Clara County in an "agency shop," where employees were forced to either join SEIU Local 521 and pay full membership dues, or else pay "fair share service fees" to the union as a condition of their employment.

105.  When Ms. Park began her employment with Santa Clara County, she was told that union membership was a condition of employment. Neither her employer

nor the union ever told Ms. Park that she had a constitutional right to refuse union membership and pay a reduced amount in "fair share service fees."

106.  Because Ms. Park was never informed of her rights and was led to believe that she was required to join the union as a condition of her employment, Ms. Park was enrolled in union membership and paid dues to SEIU Local 521 until the Supreme Court's ruling in *Janus.*

107.  Ms. Park never would have joined or paid any money to the union had she not been forced to work in an unconstitutional agency shop.

108.  After the Supreme Court announced its ruling in *Janus*, Ms. Park called SEIU Local 521 and resigned her membership over the phone. She also asked the union to stop deducting membership dues from her paycheck. During this call, she spoke to a person named Diego. The union honored Ms. Park's resignation and stopped taking money from her paycheck.

## STATEMENT OF FACTS—SEIU LOCAL 721 DEFENDANTS

### 1. Stephanie Caudel

109.  Plaintiff Stephanie Caudel works as an accounting technician for Riverside County.

110.  Before the Supreme Court's ruling in *Janus*, Ms. Caudel worked in an "agency shop," where employees were forced to either join SEIU Local 721 and pay full membership dues, or else pay "fair share service fees" to the union as a condition of their employment.

111.  Ms. Caudel reluctantly decided to join the union because she decided that the difference between full membership dues and "fair share service fees" would not have been worth the loss of her vote in collective-bargaining matters.

112. After the Supreme Court announced its ruling in *Janus v. AFSCME Council 31*, 138 S. Ct. 2448 (2018), Ms. Caudel mailed a letter to SEIU Local 721 demanding that the union cease taking membership dues from her paycheck. *See* Exhibit 9. Ms. Caudel wrote: "In accordance with the recent Janus v AFSCME case, I am revoking SEIU's authorization to deduct any dues/fees from my paycheck. Please promptly forward a stop deduction notification to Riverside County payroll. I request that the appropriate person within SEIU 721 also reply to me, in writing, confirming receipt of this notice and indicating when the required stop deduction notice was sent." *See* Exhibit 9.

113. Ms. Caudel sent this letter by certified mail, return receipt requested, and the union received Ms. Caudel's letter on August 8, 2018. *See* Exhibit 9.

114. In response, Ms. Caudel received a letter from Bob Schoonover, the President of SEIU Local 721, dated August 14, 2018. *See* Exhibit 9.

115. The Schoonover letter implies that the union would not accept Ms. Caudel's letter as a resignation of her union membership. It begins: "You are receiving this letter because you contacted SEIU Local 721 to cancel your union membership. *Before making this decision*, I urge you to consider the important benefits of union membership. . . ." *See* Exhibit 9 (emphasis added).

116. The Schoonover letter also announced that SEIU Local 721 would continue to take membership dues from Ms. Caudel's paycheck notwithstanding her instructions to stop. The letter explains: "[W]e want to be clear that you may cancel your membership at any time. But please be advised that, you made a commitment to pay an amount equal to dues to support your union's work when you became a member. To end that commitment, you agreed to terminate dues deductions only within the prescribed window period outlined in your contract or membership application. . . . If you are within your opt-out window period and still wish to cease dues

1   deductions, you may do so by delivering a signed letter stating that you no longer
2   wish to be a union member. Please be sure the letter contains the following infor-
3   mation: full name (as it would appear on your paycheck); current mailing address and
4   telephone number; employee ID number; and original signature. We encourage you
5   to send all mailed correspondences by certified mail, so there is a record of it being
6   sent." *See* Exhibit 9.

7       117.  Ms. Caudel also sent a letter to the Human Resources Department at Riv-
8   erside County, informing them that she had revoked her authorization for payroll
9   deductions and demanding that they halt the deduction of union-related fees from
10  her paycheck. *See* Exhibit 9.

11  **2. Samira Golbad**

12      118.  Plaintiff Samira Golbad works as an accounting technician for Riverside
13  County.

14      119.  Before the Supreme Court's ruling in *Janus*, Ms. Golbad worked in an
15  "agency shop," where employees were forced to either join SEIU Local 721 and pay
16  full membership dues, or else pay "fair share service fees" to the union as a condition
17  of their employment.

18      120.  When Ms. Golbad started working for Riverside County in February 2016,
19  she was led to believe that union membership was a mandatory condition of employ-
20  ment. Neither the union nor Ms. Golbad's employer had ever informed her that she
21  had a constitutional right to refuse union membership and pay a reduced amount in
22  "fair share service fees."

23      121.  Ms. Golbad never would have joined or paid money to the union had she
24  not been forced to work in an unconstitutional agency shop.

122.   After the Supreme Court announced its ruling in *Janus*, Ms. Golbad mailed a letter to SEIU Local 721's Riverside office and demanded that the union cease taking membership dues from her paycheck. *See* Exhibit 10.

123.   In response, Ms. Golbad received the same letter from Bob Schoonover, the President of SEIU Local 721, that Ms. Caudel had received. *See* paragraphs 115–116; *see also* Exhibit 10. Ms. Golbad received these letters twice, the first was dated August 14, 2018, and the second was dated August 21, 2018.

124.   On September 4, 2018, Ms. Golbad sent a *second* letter to SEIU Local 721 in response to Mr. Schoonover's letter of August 14, 2018. The letter reiterated Ms. Golbad's demand to halt the payroll deduction of union dues and concluded with the following: "I do not wish to remain a member of SEIU 721. **Please immediately notify Riverside County payroll that I have exercised my right to opt-out of your union.**" *See* Exhibit 10 (emphasis in original).

125.   In response to this letter, SEIU 721 sent Ms. Golbad the same letter from Bob Schoonover that she had previously received. This time the letter was dated September 6, 2018. *See* Exhibit 10.

126.   The Schoonover letter implies that the union was not even accepting Ms. Golbad's resignation, in addition to rejecting her demands to halt the payroll deduction of union dues. *See* Exhibit 10 ("You are receiving this letter because you contacted SEIU Local 721 to cancel your union membership. *Before making this decision*, I urge you to consider the important benefits of union membership. . . ." (emphasis added)). But Ms. Golbad had already made her decision to resign and communicated that decision clearly and unequivocally in her letter of September 4, 2018. The union of course may ask Ms. Golbad to reconsider her decision to resign, but it cannot pretend as though she has not *made* that decision that they are asking her to reconsider.

127.  Ms. Golbad also asked the Human Resources department at Riverside County to stop diverting her paycheck to SEIU 721. Human Resources refused to honor Ms. Golbad's request, explaining that they cannot halt the payroll deduction of union dues unless the union instructs them to stop.

**3. Lorenzo Nolan**

128.  Plaintiff Lorenzo Nolan works at the Los Angeles County Department of Public Social Services.

129.  Before the Supreme Court's ruling in *Janus*, Ms. Nolan worked in an "agency shop," where employees were forced to either join SEIU Local 721 and pay full membership dues, or else pay "fair share service fees" to the union as a condition of their employment.

130.  Mr. Nolan was a "fair share service fee" payer until the Supreme Court's ruling in *Janus*, but the union took more than $3,500 from his wages on account of this unconstitutional agency-shop arrangement.

131.  Because Mr. Nolan was a "fair share service fee" payer, the union stopped tapping Mr. Nolan's paycheck as soon as the *Janus* ruling was announced.

**4. Javier Palmerin**

132.  Plaintiff Javier Palmerin works in the Los Angeles County Public Defender's Office.

133.  Before the Supreme Court's ruling in *Janus*, Mr. Palmerin worked in an "agency shop," where employees were forced to either join SEIU Local 721 and pay full membership dues, or else pay "fair share service fees" to the union as a condition of their employment.

134.  Mr. Palmerin reluctantly chose to join SEIU Local 721 because he decided that the difference between full membership dues and "fair share service fees" would not have been worth the loss of his vote in collective-bargaining matters.

135.  Mr. Palmerin never would have joined or paid any money to SEIU Local 721 had he not been forced to work in an unconstitutional agency shop—and had he not been subject to an unconstitutional financial penalty for exercising his constitutional right to decline union membership.

136.  After the Supreme Court announced its ruling in *Janus v. AFSCME Council 31*, 138 S. Ct. 2448 (2018), Mr. Palmerin resigned his union membership and demanded that the union cease taking membership dues from his paycheck. The union honored Mr. Palmerin's demands only because Mr. Palmerin submitted his request during the annual two-week opt-out period that the union had imposed on him.

**STATEMENT OF FACTS—SEIU LOCAL 1021 DEFENDANTS**

**1. Maureen O'Brien**

137.  Plaintiff Maureen O'Brien works for the city and county of San Francisco.

138.  Before the Supreme Court's ruling in *Janus*, Ms. O'Brien worked in an "agency shop," where employees were forced to either join SEIU Local 1021 and pay full membership dues, or else pay "fair share service fees" to the union as a condition of their employment.

139.  When Ms. O'Brien began her employment with city and county of San Francisco, she was led to believe that union membership was required as a condition of employment. Neither her employer nor the union ever told Ms. O'Brien that she had a constitutional right to refuse union membership and pay a reduced amount in "fair share service fees."

140.  Because Ms. O'Brien was never informed of her rights, she was enrolled in union membership and paid dues to SEIU Local 1027 until the Supreme Court's ruling in *Janus.*

141.  Ms. O'Brien never would have joined or paid any money to the union had she not been forced to work in an unconstitutional agency shop—and had she not

1   been subject to an unconstitutional financial penalty for exercising her constitutional

2   right to decline union membership.

3       142.   After the Supreme Court announced its ruling in *Janus*, Ms. O'Brien mailed

4   a letter to the union's headquarters announcing her resignation and demanding that

5   the union stop deducting membership dues from her paycheck. The union honored

6   Ms. O'Brien's request and stopped taking money from her paycheck.

7           **STATEMENT OF FACTS—SEIU LOCAL 2015**

8   **1. Teresa Boyle**

9       143.   Plaintiff Teresa A. Boyle is a home health-care provider. Ms. Boyle cares for

10   her mother and is paid for her services by California's Medicaid program.

11      144.   Ms. Boyle started working as a home health-care provider in 2011. At that

12   time, Ms. Boyle worked in an "agency shop," where home health-care workers were

13   forced to either join SEIU Local 2015 and pay full membership dues, or else pay "fair

14   share service fees" to the union.

15      145.   Ms. Boyle noticed that SEIU Local 2015 was taking money from her

16   paychecks and asked whether she could stop these payments. Ms. Boyle was told that

17   there was no way to avoid paying dues to the union.

18      146.   Neither the union nor the State ever informed Ms. Boyle that she had a

19   constitutional right to refuse union membership and pay a reduced amount in "fair

20   share service fees" to SEIU Local 2015. Because Ms. Boyle was left unaware of this

21   option, she remained a member of SEIU Local 2015 during her time as a home

22   health-care provider.

23      147.   When the Supreme Court announced its ruling in *Harris v. Quinn*, 134 S.

24   Ct. 2618 (2014), neither the union nor the State ever informed Ms. Boyle that she

25   had the right to stop the union from garnishing her wages by resigning her union

26   membership. Ms. Boyle did not learn about the *Harris* ruling until after the Supreme

Court announced its decision in *Janus*. Because Ms. Boyle was left unaware of her constitutional rights under *Harris*, she remained a member of SEIU Local 2015 from 2014 through 2018.

148.   Ms. Boyle never would have joined or paid any money to SEIU Local 2015 had she not been forced to work in an unconstitutional agency shop from 2011–2014.

149.   Ms. Boyle would not have remained in the union after *Harris* had she been informed of her constitutional rights under that decision.

150.   After the Supreme Court announced its ruling in *Janus*, Ms. Boyle mailed a letter to the union on July 15, 2018, announcing her resignation from SEIU Local 2015 and demanding that the union stop taking membership dues from her paychecks. *See* Exhibit 11.

151.   The union responded by mailing a letter from Laphonza Butler, the President of SEIU Local 2015, that resembles the Schoonover letter described in paragraphs 115–116. *See* Exhibit 11.

152.   The Butler letter acknowledges that Ms. Boyle "may cancel [her] union membership at any time." *Id*. But it also indicates that the union was refusing to accept Ms. Boyle's resignation in her letter of July 15, 2018. The letter said: "*If you still want to cancel our membership*, you may do so by sending a signed letter stating that you no longer wish to be a union member, and stating that you understand that your dues deductions will continue unless and until you send a letter during the period specified above (or during any of the later cancellation periods available to you)." *Id*. (emphasis added).

153.   The final paragraph in the Butler letter also indicates that the union was refusing to accept Ms. Boyle's resignation. *See id*. ("*Before making this important decision*, I urge you to consider the important benefits of union membership." (emphasis added)). But Ms. Boyle's letter of July 15, 2018, made clear that she had already made

the decision to resign. *See* Exhibit 11 ("With this letter I am resigning my membership in the union."); *id.* ("I am immediately terminating my membership in the union and all of its affiliates"). The Butler letter responds as though Ms. Boyle had merely inquired about the possibility of resigning, when Ms. Boyle had clearly and unequivocally announced that she *was* resigning and already made her decision.

154.   The Butler letter also announced that SEIU Local 2015 would continue to take membership dues from Ms. Boyle's paycheck. The letter explains: "As we explained when you contacted the Union, you chose to sign a union membership card that includes a commitment to continue paying dues until either the fifteen-day period after to the anniversary date of the time the card was signed or until the fifteen-day period after the expiration date of your collective bargaining agreement (whichever is sooner). If you do not request cancellation of dues deduction during any such fifteen-day period, the deductions will continue until the next such period, when you will again have the opportunity to cancel dues deductions. The next period during which you may cancel your dues authorization is **1/6/2019–1/20/2019**."). *See* Exhibit 11.

**2. Erin Thompson**

155.   Plaintiff Erin Thompson is a home health-care worker in San Mateo County. She cares for her sister and her nephew, both of whom live with her, as well as a third client who lives in San Francisco.

156.   Ms. Thompson began working as home a health-care provider in 2012. At that time, Ms. Thompson lived in Los Angeles County.

157.   Shortly after Ms. Thompson enrolled as a home health-care provider in 2012, two individuals affiliated with SEIU Local 2015 visited Ms. Thompson at her home. They sought to persuade Ms. Thompson to join the union and contribute money to "COPE," the SEIU's "Committee on Political Education."

158.   These individuals informed Ms. Thompson that her union membership dues would be $10 per month and that her monthly COPE contribution would be $5 per month.

159.   They also informed Ms. Thompson that the COPE contribution was voluntary. They did not, however, tell Ms. Thompson that she had the right to decline union membership and pay "fair share service fees" in lieu of union membership dues.

160.   As a result, Ms. Thompson was led to believe that she was required to enroll in the union as a condition of working as a home health-care provider.

161.   Ms. Thompson signed the documents to enroll herself in union membership, on the understanding that the union would take only $10 per month in membership dues from her paycheck. Ms. Thompson declined the union's invitation to provide financial support to COPE.

162.   After Ms. Thompson signed these documents in 2012, the State Controller began deducting union dues from Ms. Thompson's paycheck and paying that money directly to SEIU 2015.

163.   Initially the union took only $10 per month from Ms. Thompson's paycheck, consistent with the representations it made during the visit to her home. But later the union began taking additional money from Ms. Thompson's paycheck, without seeking or obtaining Ms. Thompson's consent to these payments.

164.   In 2014, for example, the union started taking $10 in COPE deductions from Ms. Thompson's paycheck, even though Ms. Thompson has never consented to COPE contributions and specifically rejected the union's invitation to contribute to COPE when the union's representatives visited Ms. Thompson at her home. *See* Exhibit 12 (paystub dated December 8, 2014, for services rendered to Kevan J. Hill). Worse, the union has been taking $10 per month in COPE deductions from *each* of

the three separate monthly payments that Ms. Thompson receives for the three separate clients that she serves. *See id.* (paystub dated July 9, 2018, for services provded to Elka Gilmore; paystub dated August 6, 2018 for services provided to Kevan J. Hill; paystub dated September 7, 2018, for services provided to Sharon M. Quinn, each with $10 taken for "COPE/PEOPLE"). But the union has not been entirely consistent; in some pay periods the union has chosen not to tap Ms. Thompson's paycheck for COPE contributions. *See id.* (paystub dated May 23, 2017, for services provided to Kevan J. Hill, with no COPE deductions taken out). It appears that the union has decided that it can take COPE contributions from Ms. Thompson's paycheck whenever it wants to.

165.  Worse still, the union has been taking monthly membership dues from *each* of the three separate monthly payments that Ms. Thompson receives for the three different clients that she serves. Monthly union dues are to be assessed *per worker*; they are not assessed per client—and they are not to be doubled or tripled whenever a home health-care worker takes on additional clients.

166.  The union has also been taking money from Ms. Thompson's paychecks for health insurance and dental insurance that she never requested or signed up for.

167.  When the Supreme Court announced its ruling in *Harris v. Quinn*, 134 S. Ct. 2618 (2014), neither the union nor the State informed Ms. Thompson that she had the right to stop the union from garnishing her wages by resigning her union membership. Ms. Thompson did not learn about the ruling in *Harris* until shortly before the Supreme Court announced its decision in *Janus*. Because Ms. Thompson was unaware of her constitutional rights under *Harris*, she remained a member of SEIU Local 2015 from 2014 through 2018.

168.  Ms. Thompson would not have remained in the union after *Harris* had she been informed of her constitutional rights under that decision.

169.   Ms. Thompson never would have joined or paid any money to SEIU Local 2015 had she not been forced to work in an unconstitutional agency shop from 2011–2014.

170.   On June 7, 2018—after *Harris* but before *Janus*—Ms. Thompson mailed a letter to SEIU Local 2015 announcing her resignation from the union and demanding that the union stop taking money from her paycheck. *See* Exhibit 12. Ms. Thompson sent this letter by certified mail, return receipt requested. *See* Exhibit 12.

171.   Ms. Thompson never received the return receipt back after mailing this letter to SEIU Local 2015.

172.   On July 11, 2018—two weeks after *Janus*—Ms. Thompson mailed a second letter to SEIU Local 2015 announcing her resignation from the union and demanding that the union stop taking money from her paycheck. *See* Exhibit 12. The union has not acknowledged or responded to that letter.

173.   Ms. Thompson has telephoned the union at least nine times since 2015 in an effort to stop these unauthorized garnishments of her wages. Each time she has called the union has been unhelpful and uncooperative.

**STATEMENT OF FACTS—CSEA AND CALPERS DEFENDANTS**

174.   Plaintiff Mariam Noujaim is a retired state employee.

175.   Since her retirement in April 2017, Ms. Noujaim has been receiving a pension administered by the California Public Employees' Retirement System (CalPERS).

176.   Ms. Noujaim's pension is directly deposited into her bank account, and she does not receive any pay stubs or written documentation that shows whether any money is being diverted from her pension.

177.   After retiring, Ms. Noujaim began receiving e-mails from the California State Employees Association (CSEA).

178.  Ms. Noujaim was surprised to receive those e-mails, because the CSEA has not represented Ms. Noujaim since the 1980s. At the time of her retirement, SEIU Local 1000 had been representing Ms. Noujaim and her bargaining unit.

179.  In June of 2018, Ms. Noujaim phoned the CSEA and asked why she was receiving e-mails from their organization. The person on the phone explained that Ms. Noujaim was receiving those e-mails because she was enrolled as a member of California State Retirees—the CSEA's affiliate for retired state employees. The person on the phone also informed Ms. Noujaim that California State Retirees was taking $9.00 per month from Ms. Noujaim's pension as membership dues.

180.  Ms. Noujaim had no idea that CalPERS had been diverting money from her pension to California State Retirees. These pension deductions had been occurring for more than a year, yet the first time Ms. Noujaim learned of it was during this phone call with the CSEA.

181.  Ms. Noujaim protested that she had never agreed to join California State Retirees—and she had not authorized California State Retirees or any of its affiliates to tap her pension for membership dues. The person on the phone responded by telling Ms. Noujaim that she had signed documents in 1980 that authorized California State Retirees to enroll her in membership and tap her pension for dues upon her retirement.

182.  When Ms. Noujaim demanded to see the documents that she had supposedly signed in 1980, the person on the phone explained that Ms. Noujaim would need to submit a written request for these documents.

183.  During this phone call, Ms. Noujaim also demanded that California State Retirees stop collecting membership dues from her pension. The person on the phone responded that Ms. Noujaim would need to submit that request by mail or fax.

184.   On June 12, 2018, Ms. Noujaim faxed a letter to the CSEA demanding that it cancel her membership and cease taking money from her pension. *See* Exhibit 13.

185.   The fax had no effect, and the CSEA neither acknowledged receipt of the fax nor halted the collection of membership dues from Ms. Noujaim's pension.

186.   On August 3, 2018, Ms. Noujaim called the CSEA a second time to ask why California State Retirees was continuing to raid her pension when she had clearly and unequivocally instructed them to stop. This time she spoke to a person named Wendy.

187.   Wendy told Ms. Noujaim that the CSEA never received the fax that she had sent on June 12, 2018.

188.   To this day, CalPERS is continuing to divert Ms. Noujaim's pension to an organization that she does not support, and California State Retirees is continuing to take money from Ms. Noujaim's pension without her approval. *See* Exhibit 13.

## STATEMENT OF CLAIM—UNCONSTITUTIONAL AGENCY SHOP

189.   The compelled subsidy that the plaintiffs were forced to pay to the union defendants as a condition of their employment violated their constitutional rights—regardless of whether they chose to remain in the union and pay full membership dues or resign their membership and pay "fair share service fees." *See Janus v. AFSCME Council 31*, 138 S. Ct. 2448 (2018).

190.   The Supreme Court's rulings in *Janus* and *Harris v. Quinn* are retroactive. *See Harper v. Virginia Dep't of Taxation*, 509 U.S. 86, 96 (1993) ("[A] rule of federal law, once announced and applied to the parties to the controversy, must be given full retroactive effect by all courts adjudicating federal law.").

191.   The union defendants and their affiliates were acting under color of state law by imposing these mandatory union payments on the plaintiffs and their fellow

class members. *See, e.g.,* Cal. Gov't Code §§ 3502.5, 3515.7, 3583.5; *Lugar v. Edmondson Oil Co. Inc.*, 457 U.S. 922 (1982).

192.   The union defendants and their affiliates have committed the torts of conversion and trespass to chattels by confiscating money belonging to the plaintiffs without obtaining legally valid consent. The union defendants are therefore liable to the plaintiffs in tort and in an action for replevin. The union defendants cannot defend their tortious behavior by relying on sections 3502.5, 3515.7, or 3583.5 of the California Government Code, because those statutes are unconstitutional and unconstitutional statutes cannot confer immunity on tortious conduct.

193.   Nor can the unions defend themselves by claiming that the plaintiffs "consented" to the payment of full membership dues, because their consent to pay union membership dues was unconstitutionally coerced by the pre-*Janus* agency-shop arrangements. Any public employee who agreed to union membership before *Janus* did so at a time when they were *compelled* to pay at least the amount of "fair share service fees" whether they joined the union or not. A pre-*Janus* public employee who agreed to union membership under these circumstances consented to pay only the *difference* between full union dues and the compulsory "fair share service fees" that would have been imposed had they refused to join.

194.   The plaintiffs and their fellow class members are entitled to a refund in the amount of the "fair share service fees" that they were forced to pay regardless of whether they retained or resigned her union membership.

195.   Ms. Boyle and Ms. Thompson and their fellow class members are entitled to a refund of all union dues that SEIU Local 2015 collected after *Harris v. Quinn* from home health-care workers who were not informed of their constitutional rights under *Harris* and who did not knowingly and freely waive those constitutional rights.

196.  Ms. Browne and Mr. Miller are suing on behalf of all current and former public employees in California who: (1) are or were members of the CSUEU or its affiliates; and (2) would not have joined or paid money to the union had they not worked in an unconstitutional agency shop. The class includes anyone who has ever fallen within this definition, including former and retired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

197.  Mr. Finn, Ms. Noujaim, and Mr. White are suing on behalf of all current and former public employees in California who: (1) are or were members of SEIU Local 1000 or its affiliates; and (2) would not have joined or paid money to the union had they not worked in an unconstitutional agency shop. The class includes anyone who has ever fallen within this definition, including former and retired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

198.  Ms. Aliser, Mr. McCavitt, and Ms. Park are suing on behalf of all current and former public employees in California who: (1) are or were members of SEIU Local 521 or its affiliates; and (2) would not have joined or paid money to the union had they not worked in an unconstitutional agency shop. The class includes anyone who has ever fallen within this definition, including former and retired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

199.  Ms. Caudel, Ms. Golbad, and Mr. Palmerin are suing on behalf of all current and former public employees in California who: (1) are or were members of SEIU Local 721 or its affiliates; and (2) would not have joined or paid money to the union had they not worked in an unconstitutional agency shop. The class includes anyone

who has ever fallen within this definition, including former and retired public employ-ees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

200.  Mr. Nolan is suing on behalf of all current and former public employees in California who paid "fair share service fees" to SEIU Local 721 before the Supreme Court's ruling in *Janus*. The class includes anyone who has ever fallen within this definition, including former and retired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

201.  Ms. O'Brien is suing on behalf of all current and former public employees in California who: (1) are or were members of SEIU Local 1021 or its affiliates; and (2) would not have joined or paid money to the union had they not worked in an unconstitutional agency shop. The class includes anyone who has ever fallen within this definition, including former and retired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

202.  Ms. Boyle and Ms. Thompson are suing on behalf of all current and former home health-care workers in California who: (1) are or were members of SEIU Local 2015 or its affiliates; and (2) would not have joined or paid money to the union had they not worked in an unconstitutional agency shop. The class includes anyone who has ever fallen within this definition, including former and retired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

## STATEMENT OF CLAIM—UNCONSTITUTIONAL
## GARNISHMENT OF WAGES POST-*JANUS*

203.  Some but not all of the union defendants are violating the Constitution by preventing public employees from resigning their union membership and terminating the compelled payment of union dues. Public employees have a constitutional right

to terminate their union membership at any time, and when they assert this right the union must honor their wishes and immediately halt the payroll deductions of union dues. *See Janus*, 138 S. Ct. at 2486 ("Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay.").

204.   A public employer and a public-employee union are constitutionally obligated to honor an employee's decision to resign his union membership, and once the employee resigns the employer and the union must immediately halt the payroll deduction of union dues, regardless of how the employee chooses to communicate his resignation.

205.   The CSUEU, SEIU Local 721, and SEIU Local 2015 are violating the Speech Clause and the Supreme Court's ruling in *Janus* by tapping the plaintiffs' paychecks for membership dues after they had clearly and unequivocally announced their resignations from the union. *See* Exhibit 6 (e-mail from Renee Browne) ("I am resigning my membership in the CSUEU Chapter 321 and all of its affiliates effective immediately. Please immediately stop taking union membership dues or any other union-related fees from my paycheck."); Exhibit 7 ("I Kenton Miller, resign my membership in CSUE unit 9, immediately, and I want my payroll deduction to cease immediately."); *see* Exhibit 10 (letter from Samira Golbad) ("I do not wish to remain a member of SEIU 721. Please immediately notify Riverside County payroll that I have exercised my right to opt-out of your union." (emphasis removed)); *see* Exhibit 11 (letter from Teresa Boyle) ("With this letter I am resigning my membership in the union."); *see also Janus*, 138 S. Ct. at 2486 ("Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any

1    other attempt be made to collect such a payment, unless the employee affirmatively

2    consents to pay.").

3        206.  The CSUEU, SEIU Local 721, and SEIU Local 2015 are violating the

4    Speech Clause and *Janus* by insisting that that employees who have announced their

5    resignation from the union take the *additional* step of mailing a signed letter request-

6    ing the cancellation of payroll deductions—and to allow them this opportunity only

7    during a limited opt-out window that comes around once per year. *See* Exhibits 6–7

8    (CSUEU e-mails to Ms. Browne and Mr. Miller); Exhibits 9–10 (Schoonover letter);

9    Exhibit 11 (Butler letter). The plaintiffs ceased to be union members at the moment

10   they e-mailed or mailed their resignation letters to the union, and *Janus* forbids the

11   union to touch the paycheck of a non-union member unless it secures "clear and

12   affirmative consent" in advance. *See Janus*, 138 S. Ct. at 2486.

13       207.  SEIU Local 721 and SEIU Local 2015 are violating the Speech Clause and

14   *Janus* by refusing to accept or recognize Ms. Golbad and Ms. Boyle's resignations

15   from the union after each of them had clearly and unequivocally declared their resig-

16   nations in writing. *See* Exhibit 10 (Schoonover letter); Exhibit 11 (Butler letter). In-

17   stead of accepting their resignations, the unions told them to think it over and write

18   back again if they *really* wanted to resign. *See* Exhibit 10 (Schoonover letter); Exhibit

19   11 (Butler letter). A union must immediately accept and implement a public em-

20   ployee's decision to resign from the union; it cannot require an employee to submit a

21   second resignation letter after the employee clearly communicated his desire to resign

22   in the first.

23       208.  The California State Controller is violating the Speech Clause and *Janus* by

24   deducting union membership dues from the paychecks of public employees who have

25   resigned their union membership.

209.   The Board of Trustees of the California State University is violating the Speech Clause and *Janus* by deducting union membership dues from the paychecks of Ms. Browne and Mr. Miller. When a public employee informs his employer that he has resigned from the union and no longer wants union-related payments deducted from his paycheck, the Speech Clause compels the public employer to immediately implement the employee's instructions. *See Janus*, 138 S. Ct. at 2486 ("Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay."). Mr. Browne and Mr. Miller cc'd their employer's payroll office on their union resignation e-mails, and the university was constitutionally obligated to recognize Mr. Browne and Mr. Miller's resignation from the union and halt the payroll deductions of union dues. Any state law or provision in a collective-bargaining agreement that requires an employer to continue the payroll deduction of union dues from an employee who has resigned his union membership is unconstitutional and void.

210.   Section 1157.12(b) of the California Government Code requires public employers (including the Trustees of California State University) to "[d]irect employee requests to cancel or change deductions for employee organizations to the employee organization, rather than to the public employers." Exhibit 1. Section 1157.12(b) also requires public employers to "rely on information provided by the [union] regarding whether deductions for [a union] were properly canceled or changed, and the [union] shall indemnify the public employer for any claims made by the employee for deductions made in reliance on that information." *Id*. Finally, section 1157.12(b) provides that payroll deductions "may be revoked only pursuant to the terms of the employee's written authorization." *Id*.

211.   Each of these provisions in section 1157.12(b) is unconstitutional. A public employer must immediately cease union-related payroll deductions upon learning that an employee has resigned from the union—regardless of whether the employee learns this from the union or the employee. *See Janus*, 138 S. Ct. at 2486. It is equally unconstitutional to limit a public employee's right to terminate payments to a union that he no longer belongs to. *See Janus*, 138 S. Ct. at 2486.

212.   Any provision in a collective-bargaining agreement that purports to limit an employee's ability to resign his union membership is unconstitutional and unenforceable. A union and a public employer cannot agree to limit an employee's constitutional right to withdraw his union membership and halt the payroll deduction of union dues.

213.   Any union-membership contract that purports to limit an employee's constitutional right to quit the union or withdraw financial support is legally unenforceable. A public employee has the constitutional right to revoke his or her union membership and union-related payments at any time, and this right cannot be limited by the union in any way.

214.   In addition, any public employee that signed a pre-*Janus* union-membership contract was unconstitutionally coerced and did not provide legally valid consent. An employee that chose to join the union while working in an unconstitutional agency shop was *compelled* to pay at least the amount of "fair share service fees" to the union regardless of whether he joined, and any agreement to pay membership dues under these circumstances is tainted by the unconstitutional agency-shop arrangement. A person who is told, "Sign this contract or else I will take $500 per year from your paycheck," and then signs the contract in response to this "offer," has signed the contract under duress and has not provided legally valid consent.

215.   Finally, a waiver of constitutional rights cannot be presumed, and any such waiver must be "freely given and shown by 'clear and compelling' evidence." *Janus*, 138 S. Ct. at 2486. The union cannot tap an employee's paycheck unless it can show that the employee has *waived* his constitutional right to withhold payments to a public employee union, and such a waiver must be "freely given and shown by 'clear and compelling' evidence." *Janus*, 138 S. Ct. at 2486. A waiver of constitutional rights must also be fully informed. *See Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."). The union appears to believe that the burden is on the plaintiffs to "opt out" of union payments by navigating the obstacle course that the union and the State have placed in their path. Instead, the burden is on the *union* to show that the plaintiffs have affirmatively waived their constitutional right to keep her money away from the union, and that they have done so freely and with full knowledge of their constitutionally protected rights.

216.   The CSUEU, SEIU Local 721, SEIU Local 2015, and every other union defendant must refund all money that they took from any public employee who had previously announced his resignation from the union and informed the union of that decision.

217.   The CSUEU, SEIU Local 721, and SEIU Local 2015 are liable for punitive damages for purposefully and intentionally taking money from the paychecks of employees who had previously announced their resignations from the union and informed the union of their resignations. *See Janus*, 138 S. Ct. at 2486 ("Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay.").

218.  SEIU Local 721 and SEIU Local 2015 are liable for an additional amount of punitive damages for refusing to accept the resignations letters submitted by Ms. Goldad and Ms. Boyle—and for instructing those plaintiffs to submit an *additional* resignation letter after those plaintiffs had clearly announced in their initial letter that they had decided to quit the union. *See* Exhibit 10 (Schoonover letter); Exhibit 11 (Butler letter).

219.  The California State Controller and the Board of Trustees of the California State University must immediately halt the payroll deduction of union dues from any public employee or home health-care worker who has resigned their union member-ship. *See Janus*, 138 S. Ct. at 2486 ("Neither an agency fee nor any other payment to the union may be deducted from a nonmember's wages, nor may any other attempt be made to collect such a payment, unless the employee affirmatively consents to pay.").

220.  Ms. Browne and Mr. Miller are suing on behalf of all current and former members of the CSUEU whose paychecks were tapped for union-related payments after they had told the union that they were resigning their memberships. The class includes anyone who has ever fallen within this definition, including former and re-tired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

221.  Ms. Golbad is suing on behalf of all current and former members of SEIU Local 721 or its affiliates whose paychecks were tapped for union-related payments after they had told the union that they were resigning their memberships. The class includes anyone who has ever fallen within this definition, including former and re-tired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

222.   Ms. Boyle and Ms. Thompson are suing on behalf of all current and former members of SEIU Local 2015 or its affiliates whose paychecks were tapped for union-related payments after they had told the union that they were resigning their memberships. The class includes anyone who has ever fallen within this definition, including former and retired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

## STATEMENT OF CLAIMS—SEIU LOCAL 1000

223.   In 2017, SEIU Local 1000 revoked Mr. Finn's status as a "non-germane objector" and started tapping his paycheck for fees that would fund the union's political and ideological advocacy. The union did this without seeking or obtaining Mr. Finn's permission or consent. It then subjected Mr. Finn to these increased fees for an entire year, using a portion of that money to fund political and ideological advocacy that Mr. Finn opposed and had a constitutional right not to fund. And the union denied Mr. Finn the opportunity to opt out after he had discovered that the union had canceled his "non-germane objector" status without his consent.

224.   SEIU Local 1000 violated Mr. Finn's constitutional rights under the Speech Clause by revoking his "non-germane objector" status and forcing him to fund political and ideological advocacy without without seeking or obtaining Mr. Finn's consent.

225.   SEIU Local 1000 violated state tort law by taking money from Mr. Finn's paycheck without seeking or obtaining Mr. Finn's permission or consent.

226.   The California State Controller violated Mr. Finn's constitutional rights under the Speech Clause by diverting these increased fees from Mr. Finn's paycheck when Mr. Finn had previously opted for "non-germane objector status" and had never consented to fund the union's political and ideological advocacy.

227.   SEIU Local 1000 must refund to Mr. Finn the difference between the "fair-share service fees" that it imposed from July 2017 though June 2018, and the reduced amount that Mr. Finn would have paid as a "non-germane objector" during that time period. SEIU Local 1000 must provide similar refunds to all other public employees who had their "non-germane objector" status revoked without their permission and consent.

228.   SEIU Local 1000 is liable to Mr. Finn and his fellow class members for punitive damages for taking money from their paychecks to use for political and ideological advocacy after they had specifically objected to having their money taken for such purposes. SEIU Local 1000 is further liable to Mr. Finn and his fellow class members for punitive damages for refusing to allow them to restore their "non-germane objector" status upon discovering that the union had unilaterally revoked it.

229.   Mr. Finn is suing on behalf of all current or former public employees in SEIU Local 1000 bargaining units who: (1) Opted for "non-germane objector status"; and (2) Had their "non-germane objector status" revoked by SEIU Local 1000 without their permission or consent. The class includes anyone who has ever fallen within this definition, including former and retired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

### STATEMENT OF CLAIMS—SEIU LOCAL 2015

230.   SEIU Local 2015 has taken numerous unauthorized payments from Erin Thompson's paychecks without seeking or obtaining Ms. Thompson's consent.

231.   These unauthorized payments include: (1) The COPE contributions, which Ms. Thompson has never agreed to and specifically refused when the union representatives visited her in her home; (2) The union's unlawful collection of monthly union dues from *each* of Ms. Thompson's monthly paychecks, a practice that allowed the

union to double dip and triple dip into Ms. Thompson's wages; (3) Deductions for union-sponsored health insurance and dental insurance that Ms. Thompson never requested or signed up for.

232.  The union's collection of this money from Ms. Thompson violates the Speech Clause, the Supreme Court's ruling in *Janus*, and California tort law.

233.  SEIU Local 2015 is liable to Ms. Thompson for compensatory and punitive damages for taking COPE contributions from her paycheck without seeking or obtaining her consent.

234.  SEIU Local 2015 is liable to Ms. Thompson for compensatory and punitive damages for taking monthly union dues from *each* of Ms. Thompson's monthly paychecks, a practice that illegally subjected Ms. Thompson to double or triple union dues.

235.  SEIU Local 2015 is liable to Ms. Thompson for compensatory and punitive damages for taking money from her paycheck for union-sponsored health insurance and dental insurance that Ms. Thompson never requested or signed up for.

236.  SEIU Local 2015 is equally liable to any other member of its bargaining units who was subjected to these payroll deductions without their consent.

237.  Ms. Thompson is suing on behalf of a class of all current and former members of SEIU Local 2015 or its affiliates whose paychecks were tapped for COPE contributions that they did not affirmatively consent to. The class includes anyone who has ever fallen within this definition, including former and retired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

238.  Ms. Thompson is suing on behalf of a second class of all current and former members of SEIU Local 2015 or its affiliates whose wages were tapped for monthly union dues more than once per month. The class includes anyone who has ever fallen

within this definition, including former and retired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

239.  Ms. Thompson is suing on behalf of a third class of all current and former members of SEIU Local 2015 or its affiliates whose wages were tapped for union-sponsored insurance plans that they never requested or signed up for. The class includes anyone who has ever fallen within this definition, including former and retired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

### STATEMENT OF CLAIM—ILLEGAL DUES SKIMMING

240.  The State of California is violating the federal Medicaid Act by withholding union dues and union-related payments from Ms. Boyle and Ms. Thompson's paychecks and diverting that money to SEIU Local 2015.

241.  Section 1902(a)(32) of the Social Security Act requires State Medicaid plans to pay providers directly for their services, and it forbids participating States to divert those payments to third-party entities such as labor unions. *See* 42 U.S.C. § 1396a(a)(32) ("No payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service") (attached as Exhibit 2). Although section 1902(a)(32) provides four exceptions to this statutory command, *see* 42 U.S.C. § 1396a(a)(32)(A)–(D), none of those exceptions allow a state to divert a provider's payments to a labor union. *See* Exhibit 2.

242.  This federal statutory prohibition on "dues skimming" applies regardless of whether a home health-care provider consents to the payroll deduction of union dues or union-related contributions such as COPA payments. The State *must* pay the Medicaid provider and leave it to the union to collect its payments from the provider

1    through other means—even if the provider *wants* the State to send its money directly

2    to the union.

3    243.   The State of California is flouting this unambiguous statutory command by

4    diverting Ms. Thompson's payments to SEIU Local 2015.

5    244.   In 2014, the Department of Health and Human Services (HHS) issued a

6    rule that purports to allow States to garnish union dues from the paychecks it sends

7    to Medicaid providers. *See* 42 C.F.R. § 447.10(g)(4) ("Payment may be made to a

8    third party on behalf of the individual practitioner for benefits such as health insur-

9    ance, skills training and other benefits customary for employees."). *See* Exhibit 3. This

10   rule contradicts the unambiguous text of 42 U.S.C. § 1396a(a)(32), which makes no

11   allowance for diversions of this sort from a Medicaid provider's wages. *See* Exhibit 2.

12   245.   42 C.F.R. § 447.10(g)(4) also violates the Speech Clause and *Janus* because

13   it purports to allow States to divert a Medicaid provider's paycheck to a labor union

14   without the provider's consent.

15   246.   Although HHS has announced plans to repeal or amend 42 C.F.R.

16   § 447.10(g)(4), the rule remains in effect while the notice-and-comment proceedings

17   unfold. *See* Exhibit 4.

18   247.   The Court should hold unlawful and set aside 42 C.F.R. § 447.10(g)(4),

19   and it should promptly enjoin the California State Controller from withholding or

20   diverting *any* union-related payments from the paychecks it sends to Medicaid pro-

21   viders.

22   248.   The Secretary of Health and Human Services is legally compelled to cut off

23   federal Medicaid funding to States that divert a Medicaid provider's paycheck to a

24   labor union in violation of 42 U.S.C. § 1396a(a)(32). *See* 42 U.S.C. § 1396c (at-

25   tached as Exhibit 5).

249.  Ms. Boyle and Ms. Thompson sue on behalf of a class of all Medicaid providers in California whose paychecks have been or are being tapped for union dues or union-related fees or expenses. The class includes anyone who has ever fallen within this definition, including former and retired public employees, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

## STATEMENT OF CLAIM—RETIRED STATE EMPLOYEES

250.  The California State Employees Association (CSEA) and the California State Retirees (CSR) are violating the Speech Clause, the Supreme Court's ruling in *Janus*, and state tort law by tapping Ms. Noujaim's pension without her consent.

251.  The California Public Employees' Retirement System (CalPERS) is also violating the Speech Clause and the Supreme Court's ruling in *Janus* by diverting this money from Ms. Noujaim's pension to an ideological entity such as the CSR without Ms. Noujaim's consent.

252.  California State Retirees is subject to compensatory and punitive damages for taking money from Ms. Noujaim's pension without her consent.

253.  Ms. Noujaim sues on behalf of a class of all retired state employees whose pensions are being diverted to CSEA or CSR without the pensioner's knowledge or without their consent. The class includes anyone who has ever fallen within this definition, and it includes anyone who comes within the class definition at any time before the conclusion of this action.

## STATEMENT OF CLAIM—LACK OF VALID CONSENT

254.  None of the plaintiffs in this case have ever provided legally valid consent to union membership or to the payroll deduction of union dues. Neither has any other public employee in California who agreed to union membership or payroll deductions before the Supreme Court's ruling in *Janus*.

255.  A public employee's pre-*Janus* "consent" to union membership or to the payroll deduction of union dues was unconstitutionally coerced. Any employee who agreed to union membership or payroll deductions before *Janus* did so while working in an unconstitutional agency shop, when employees who refused to join the union were subject to an unconstitutional financial penalty. *See Janus*, 138 S. Ct. 2448. So any "consent" to union membership obtained under these circumstances was the product of duress and does not qualify as legally valid consent. If a person asks you to sign a contract and threatens to take $500 per year from your paycheck if you refuse, that contract is not legally binding in any jurisdiction.

256.  Because pre-*Janus* "consent" to union membership is tainted by the unconstitutional agency-shop arrangement, the union defendants have never secured the plaintiffs' freely given and legally valid consent to pay full membership dues in a right-to-work setting, where employees have a constitutional right to withhold *all* financial support from the union.

257.  In addition, any employee who "consented" to union membership is a pre-*Janus* agency shop consented to pay only the *difference* between full membership dues and the "fair share service fees" that would have been imposed had they declined to join the union. A pre-*Janus* employee's agreement to pay that difference does not represent "consent" to pay full membership dues in a post-*Janus*, right-to-work situation.

258.  Finally, *Janus* holds that waivers of First Amendment rights cannot be presumed, and must be "freely given and shown by 'clear and compelling' evidence." *Janus*, 138 S. Ct. at 2486. So union defendants cannot tap *any* public employee's paycheck unless the employee has executed a "freely given" waiver of his constitutional right to withhold payments to a public employee union. *Janus*, 138 S. Ct. at

2486. Pre-*Janus* consent to union membership dues was not "freely given" because it was unconstitutionally coerced.

259.   The union defendants cannot treat an employee's pre-*Janus* agreement to join union membership as legally valid consent to continue union membership or payroll deductions in a post-*Janus* world—especially when the consent was given under duress and without knowledge of an employee's pre-*Janus* constitutional rights. The Court should therefore: (1) Declare that a public employee's pre-*Janus* "consent" to union membership or payroll deductions is legally insufficient to allow membership or deductions to continue in a post-*Janus*, right-to-work environment; and (2) Enjoin the union defendants and public employers from taking money from a public employee or home health-care worker unless the employee provides written authorization that: (a) post-dates the Supreme Court's ruling in *Janus* and (b) shows that the employee knowingly and freely waived his constitutional right to decline union membership and withhold payments to the union.

260.   The union defendants and public employers must also secure *informed* consent before enrolling a public employee in union membership or tapping his paycheck for membership dues. *See Brady v. United States*, 397 U.S. 742, 748 (1970) ("Waivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences."); *Hamer v. Neighborhood Hous. Servs. of Chicago*, 138 S. Ct. 13, 17 n.1 (2017) ("Waiver is the 'intentional relinquishment or abandonment of a known right.'" (quoting *Johnson* v. *Zerbst*, 304 U.S. 458, 464 (1938)). For too long, public-employee unions have left their members in the dark about their constitutional rights, and public employers refuse to inform employees of their constitutional rights because they fear an unfair-labor-practice charge. Many of the plaintiffs in this case had no idea that they had a constitutional right to decline union membership before *Janus*,

and many were unaware that the union was using membership dues to fund political lobbying and ideological advocacy that was not germane to the union's duties as a collective-bargaining representative. A employee's waiver of *Janus* rights cannot be valid unless the employee has been informed: (1) That he is not required to join the union or pay money to the union as a condition of employment; (2) That the union owes him a duty of fair representation regardless of whether he chooses to join or give money to the union; and (3) That if he chooses to enroll in union membership, the union will use a portion of his membership dues to fund political lobbying and ideological causes that he may or may not agree with.

261.  Ms. Boyle, Ms. Browne, Ms. Caudel, Ms. Golbad, Mr. Miller, Ms. Thompson, and Mr. White are suing on behalf of a class of all public employees and home health-care workers in bargaining units represented by the union defendants or their affiliates who: (1) want to resign their union membership and terminate financial support of the union; (2) would choose to leave the union and terminate financial support if they were fully informed of their constitutional right to do so; or (3) would decline to opt in to union membership by providing "clear and affirmative assent" if they were fully informed of their constitutional rights under *Janus*. The class includes anyone who comes within the class definition at any time before the conclusion of this action.

## CAUSES OF ACTION

262.  The plaintiffs bring suit under 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201, each of which supplies a cause of action for the individual and class-wide relief that they are requesting.

263.  The plaintiffs are also suing the union defendants under the state-law torts of conversion, trespass to chattels, replevin, and any other state-law cause of action that offers relief for this unlawful seizure of their personal property. The plaintiffs

1   invoke the supplemental jurisdiction of this court over these pendent state-law claims.

2   *See* 28 U.S.C. § 1367.

3   264.   Finally, the plaintiffs are suing the United States and Director Verma under

4   the Constitution and the Administrative Procedure Act, 5 U.S.C. § 706.

**DEMAND FOR RELIEF—UNCONSTITUTIONAL AGENCY SHOP**

6   265.   The plaintiffs respectfully request that the court:

7       a.   certify the plaintiff classes described in paragraphs 196–202;

8       b.   order the union defendants and their affiliates to refund to every class

9            member an amount equal to the "fair share service fees" that each

10           class member was forced to pay, regardless of whether the class mem-

11           ber retained or resigned his union membership, along with pre-judg-

12           ment and post-judgment interest;

13      c.   award costs and attorneys' fees under 42 U.S.C. § 1988;

14      d.   grant all other relief that the Court may deem just, proper, or equita-

15           ble.

**DEMAND FOR RELIEF—UNCONSTITUTIONAL GARNISHMENT**

**OF WAGES POST-*JANUS***

18   266.   The plaintiffs respectfully request that the court:

19      a.   certify the plaintiff classes described in paragraphs 220–222;

20      b.   order the CSUEU, SEIU Local 721, SEIU Local 2015, and all other

21           union defendants to refund all money that they took from any public

22           employee who had previously announced his resignation from the un-

23           ion and informed the union of that decision, along with pre-judgment

24           and post-judgment interest;

25      c.   award punitive damages against the CSUEU, SEIU Local 721, and

26           SEIU Local 2015 for purposefully and intentionally taking money

1             from the paychecks of employees who had already announced their

2             resignation from the union;

3      d.     award punitive damages against SEIU Local 721 and SEIU Local

4             2015 for refusing to accept the resignations letters submitted by Ms.

5             Goldad and Ms. Boyle, and for insisting that those plaintiffs submit

6             an additional resignation letter after they had clearly announced in

7             their initial resignation letter that they had decided to quit the union;

8      e.     issue an injunction that requires the CSUEU, SEIU Local 721, and

9             SEIU Local 2015 to immediately honor and implement an em-

10            ployee's decision to resign his union membership, regardless of when

11            or how that employee chooses to communicate that decision;

12     f.      enjoin the CSUEU, SEIU Local 721, and SEIU Local 2015 from

13            taking any money from the paycheck of any employee who has previ-

14            ously announced his resignation from the union, unless that employee

15            "clearly and affirmatively consents" to those payments;

16     g.     enjoin the Board of Trustees of the California State University from

17            deducting union dues or union-related payments from the paychecks

18            of Ms. Browne, Mr. Miller, or any other employee who has an-

19            nounced his resignation from the union and informed the payroll de-

20            partment of that fact;

21     h.     enjoin the California State Controller from deducting union dues or

22            union-related payments from the paychecks of any public employee

23            or home health-care worker who has resigned their union member-

24            ship;

25     i.      declare that section 1157.12(b) of the California Government Code

26            violates the constitutional rights of public employees and home

1   health-care workers, and permanently enjoin the defendants from en-

2   forcing it;

3  j. declare that any pre-*Janus* union-membership contract that purports

4   to limit an employee's constitutional right to quit the union or with-

5   draw financial support is legally unenforceable;

6  k. award costs and attorneys' fees under 42 U.S.C. § 1988;

7  l. grant all other relief that the Court may deem just, proper, or equita-

8   ble.

9    **DEMAND FOR RELIEF—SEIU LOCAL 1000**

10 267. The plaintiffs respectfully request that the court:

11  a. certify the plaintiff class described in paragraph 229;

12  b. order SEIU Local 1000 to refund to Mr. Finn and his fellow class

13   members the difference between between the full amount of "fair-

14   share service fees" and the reduced amount that they would have paid

15   had the union not revoked their "non-germane objector" status with-

16   out their consent;

17  c. order SEIU Local 1000 to pay punitive damages to Mr. Finn and his

18   fellow class members;

19  d. award costs and attorneys' fees under 42 U.S.C. § 1988;

20  e. grant all other relief that the Court may deem just, proper, or equita-

21   ble.

22    **DEMAND FOR RELIEF—SEIU LOCAL 2015**

23 268. The plaintiffs respectfully request that the court:

24  a. certify the plaintiff classes described in paragraphs 237–239;

b.    order SEIU Local 2015 to refund all COPE contributions that it took from Ms. Thompson and from any other home health-care worker who did not affirmatively consent to those payments;

c.    order SEIU Local 2015 to refund all excess monthly union dues that it garnished from Ms. Thompson's monthly paychecks, or from the paychecks of any other home health-care worker;

d.    order SEIU Local 2015 to refund all money that it took from Ms. Thompson or other home health-care workers for health insurance, life insurance, dental insurance, or any other union-provided insurance or benefit that the employee never requested or signed up for;

e.    award punitive damages against SEIU Local 2015 for these unauthorized garnishments of Ms. Thompson's wages, and award additional punitive damages against SEIU Local 2015 for every other employee who was subjected to similar unauthorized garnishments;

f.    award costs and attorneys' fees under 42 U.S.C. § 1988;

g.    grant all other relief that the Court may deem just, proper, or equitable.

### DEMAND FOR RELIEF—ILLEGAL DUES SKIMMING

269.  The plaintiffs respectfully request that the court:

a.    certify the plaintiff class described in paragraph 249;

b.    hold unlawful and set aside 42 C.F.R. § 447.10(g)(4), and permanently enjoin the Director of the Center for Medicare and Medicaid Services from enforcing or reviving it;

c.    enjoin the California State Controller from withholding or diverting any union-related payments from the paychecks that it sends to Medicaid providers;

d.     order SEIU Local 2015 to refund to the State any payments that were illegally deducted from the paychecks of Medicaid providers, in violation of 42 U.S.C. § 1396a(a)(32);

e.     order the State Controller to claw back any money that was taken from the paychecks of Medicaid providers and transferred to SEIU Local 2015 or other labor unions in violation of 42 U.S.C. § 1396a(a)(32);

f.     order the State Controller to restore this clawed back money to the Medicaid providers from whom it was unlawfully taken;

g.     order the Secretary of Health and Human Services to fulfill his obligations under 42 U.S.C. § 1396c by notifying California—and every other State that deducts union membership dues or union-related payments from the paychecks of Medicaid providers—that their actions are impermissible under the federal Medicaid Act, and that HHS will terminate all federal Medicaid funding to those States unless they immediately halt this practice;

h.     award costs and attorneys' fees under 42 U.S.C. § 1988;

i.     grant all other relief that the Court may deem just, proper, or equitable.

## DEMAND FOR RELIEF—RETIRED STATE EMPLOYEES

270.   The plaintiffs respectfully request that the court:

a.     certify the plaintiff class described in paragraph 253;

b.     order California State Retirees to refund all money that it took from Ms. Noujaim and any other retired state employee who did not know of and consent to these payments;

c.    award punitive damages against California State Retirees for taking money from Ms. Noujaim's pension without her knowledge and consent, and award additional punitive damages against California State Retirees for every other retired state employee whose pension was tapped without his or her knowledge and consent;

d.    enjoin California State Retirees from taking any money from a retiree's pension unless and until it obtains a signed document from the retiree that authorizes these payments in the specific dollar amount, and that includes the following language: "I understand that I am not required to join or pay money to California State Retirees (CSR), and I further understand that I have a constitutional right to withhold these payments simply by resigning my membership in CSR. Nevertheless, I am freely choosing to waive these constitutional rights, and I knowingly and freely consent to membership in CSR and to the deduction of membership dues from my pension. I understand that I may revoke my consent to these pensions deductions by notifying CalPERS or CSR in person, over the phone, in writing, or over e-mail.";

e.    enjoin the members of the Board of Administration for the California Public Employees' Retirement System (CalPERS) from diverting any money from a retiree's pension to California State Retirees unless and until CalPERS obtains a signed document from the retiree that authorizes these monthly payments in the specific dollar amount, and that includes the language described in paragraph 270(d);

f.    award costs and attorneys' fees under 42 U.S.C. § 1988;

g.   grant all other relief that the Court may deem just, proper, or equita-
ble.

**DEMAND FOR RELIEF—LACK OF VALID CONSENT**

271.  The plaintiffs respectfully request that the court:

a.   certify the plaintiff class described in paragraph 261;

b.   declare that the plaintiffs' pre-*Janus* consent to union membership or
payroll deductions was legally invalid and cannot support the contin-
ued imposition of membership dues or payroll deductions in a post-
*Janus*, right-to-work environment;

c.   permanently enjoin the union defendants, along with their officers,
agents, servants, employees, attorneys, and any other person or entity
in active concert or participation with them, from taking membership
dues or other union-related fees from the paychecks of public employ-
ees or home health-care workers unless and until that employee pro-
vides written consent to those payments that post-dates the Supreme
Court's ruling in *Janus* and that includes the following language: "I
understand that I am not required to join the union or pay money to
the union as a condition of my employment. I further understand that
a have a constitutional right to withhold all monetary payments to the
union simply by resigning my union membership, and I understand
that the union owes me a duty of fair representation regardless of
whether I remain a member of the union or give money to the union.
I also understand that if I join the union, the union will use a portion
of my union membership dues to fund political lobbying and ideo-
logical causes that I may or may not agree with. Nevertheless, I am
freely choosing to waive my constitutional rights under the Supreme

1          Court's ruling in *Janus v. American Federation of State, County, and*

2          *Municipal Employees, Council 31*, 138 S. Ct. 2448 (2018), and I

3          knowingly and freely consent to union membership and to the payroll

4          deduction of union membership dues. I also understand that I have

5          the right to revoke my consent to union membership and dues at any

6          time by notifying the union or my employer in person, in writing,

7          over the phone, or over e-mail.";

8    d.    permanently enjoin the California State Controller and the Board of

9          Trustees of California State University from taking membership dues

10         or other union-related fees from the paychecks of public employees

11         or home health-care workers unless and until that employee provides

12         written consent to those payments that post-dates the Supreme

13         Court's ruling in *Janus* and that includes the language described in

14         paragraph 271(c);

15    d.    award costs and attorneys' fees under 42 U.S.C. § 1988;

16    f.    grant all other relief that the Court may deem just, proper, or equita-

17         ble.

Respectfully submitted.

/s/ Bradley Benbrook

JONATHAN F. MITCHELL*                BRADLEY BENBROOK
Texas Bar No. 24075463               California Bar No. 177786
Mitchell Law PLLC                    Benbrook Law Group, PC
106 East Sixth Street, Suite 900     400 Capitol Mall, Suite 2530
Austin, Texas 78701                  Sacramento, California 95814
(512) 686-3940 (phone)               (916) 447-4900 (phone)
(512) 686-3941 (fax)                 (916) 447-4904 (fax)
jonathan@mitchell.law                brad@benbrooklawgroup.com

* *pro hac vice* application
  forthcoming

Dated: September 17, 2018            *Counsel for Plaintiffs and
                                     the Proposed Class*